IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2022 Session

## JEREMY MCMILLON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 286387    Barry Steelman, Judge**

---

### No. E2020-01260-CCA-R3-PC

---

The petitioner, Jeremy McMillon,[1] appeals the denial of his petition for post-conviction relief, which petition challenged his conviction of first degree murder, alleging that he was deprived of the effective assistance of counsel and that the State committed prosecutorial misconduct at trial.  Because the petitioner has failed to establish that he is entitled to post-conviction relief, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brennan M. Wingerter, Assistant Public Defender (on appeal)[2]; and Lorrie D. Miller, Chattanooga, Tennessee (at hearing), for the appellant, Jeremy McMillon.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron B. Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In August 2007, the petitioner and two co-defendants, Eric Carter and Lemario Rashard Branham, were charged with first degree premeditated murder[3] for the

---

[1]    The caption on the pro-se post-conviction petition spells the petitioner's last name "McMillion," but the petitinoer signed his name "McMillon" on that filing, and all other filings in the record use the spelling "McMillon," and we will use that same spelling.

[2]    Robert DeBusk prepared the initial brief in this case.  The court granted Mr. DeBusk's request to withdraw and appointed Ms. Wingerter in September 2021.

[3]    A charge of felony murder was dismissed prior to trial.  *State v. Jeremy McMillon*, No. E2010-01091-CCA-R3-CD, slip op. at 2 n.1 (Tenn. Crim. App., Knoxville, Sept. 22, 2011).

shooting death of Larry Lebron Parks.  *State v. Jeremy McMillon*, No. E2010-01091-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Sept. 22, 2011).  This court summarized the evidence on direct appeal:

> [The petitioner] approached Mr. Carter and suggested retaliation against someone for previous incidents and that he was "ready to do these n____s." [The petitioner] followed Mr. Carter to "Mr. G's" house to get guns, then followed Mr. Carter to the scene of the crime.  [The petitioner] exited his car and went over the hill where multiple gunshots were heard, placing himself in the vicinity of the crime.  The victim was seemingly unarmed.  In addition, immediately after the murder, the petitioner got into his car with several other men and rode back to "Mr. G's," where he bragged about the killing, saying that he was responsible for one of them being "dropped." . . .  The gun used to commit the crime was not located.  "Mr. G" claimed that he gave the "hot" assault rifle to Mr. Carter's father. . . . [The petitioner's] fingerprints were also found on [Mr. Carter's] Expedition near the gunshot residue primer.

*Id.*, slip op. at 8.  The jury convicted the petitioner as charged, and the trial court imposed a sentence of life imprisonment.  *Id.*, slip op. at 1.  This court affirmed the petitioner's conviction on direct appeal.  *Id.*

The petitioner filed a timely pro se petition for post-conviction relief, alleging myriad issues.  In a preliminary order, the trial court found that numerous claims raised by the petitioner were not cognizable in post-conviction proceedings and appointed counsel for a hearing on the remaining claims.  After the appointment of counsel, the petitioner filed an amended petition, incorporating all grounds alleged in the pro se petition and asserting numerous instances of deficient performance by trial counsel and a free-standing claim of a due process violation at the motion for new trial hearing.

At the November 2018 evidentiary hearing, the petitioner notified the court that after submitting his amended post-conviction petition, "he received a letter from the State about some unprocessed evidence found at the M[edical] E[xaminer]'s office" that related to his trial case.  The evidence was sealed in a package, and a report identified it as a "bullet from victim's clothing."  The petitioner said that the State agreed that the unprocessed evidence should be tested.  The post-conviction court noted that the petitioner's post-conviction counsel had been appointed to become a magistrate judge and that the evidentiary hearing was occurring at "the end of her six-month allotment to wrap up her pending matters" before assuming that position.  Because of post-conviction

counsel's time restraints, the post-conviction court determined to proceed with the evidentiary hearing while post-conviction counsel was still available to represent the petitioner and allowed the petitioner an opportunity to amend his post-conviction petition "once the bullet has been processed if the next attorney determines that that presents an issue that is appropriate for post-conviction review." Both parties agreed.

The petitioner testified that the only discovery materials that trial counsel provided him were "statements from witnesses" and the transcript of the preliminary hearing. He said that he received a Tennessee Bureau of Investigation ("TBI") report involving gunshot reside from a co-defendant "a couple of days before trial." He said that he first received fingerprint evidence during trial, saying, "I never got that in discovery." He said that he asked trial counsel "several times to get a copy of my full discovery." When counsel did not provide the materials, the petitioner "had to write to the Board of Professional Responsibility" ("the Board"). The petitioner said that the Board told trial counsel to get discovery materials to the petitioner "within 30 days," at which point, trial counsel "came and talked to me, told me he was going to get it to me, but I never received it."

The petitioner said that he communicated with trial counsel through letters and telephone calls, noting that "I called his office several times and sometimes just left messages with his secretary to get back, and sometimes he didn't." When trial counsel "failed to respond, I had to write the [Board] again." The petitioner estimated that he met with counsel only three times in person before trial. He felt that his discussions and preparations with trial counsel were insufficient to prepare for trial. "There's a lot of stuff that we were asking for that we never got before trial . . . and [trial counsel], he failed . . . to file a continuance so that we can get the evidence that we needed . . . [to] prepare a proper defense."

The petitioner said that the State waited until "like, a week before trial" to send a shirt that the petitioner had worn the day of the offenses to the lab for testing. He recalled that the trial court admonished the State for its delay in seeking to have the evidence tested. He said that the testing "was negative on all my clothes" but that trial counsel did not receive the results of that testing until "a day or two before" or sometime "during the trial." The petitioner reiterated that he asked trial counsel to seek a continuance "so that we can be able to look at the evidence and prepare a proper defense so we won't go in and just rush."

The petitioner testified that the day before trial, counsel told him that the petitioner's fingerprint had been found on the window of Mr. Carter's vehicle and that he explained to trial counsel how his print came to be on Mr. Carter's vehicle. He said that Mr. Carter explained the same circumstances in an affidavit. The petitioner also said that

-3-

sometime before trial, he learned that Mr. Branham had written a letter to Mr. Carter, saying that they were "gonna put it on" and "keep blaming" the petitioner for the offense. The petitioner said that Mr. Carter gave the letter to trial counsel but that counsel did not address the letter at trial despite the petitioner's asking him to bring it up.

The petitioner said that counsel advised him not to testify at trial because the State would "try to bring up my past history." He said that despite his having "no past violent history," counsel "told me it was not in my best interest to testify in my own trial on my behalf." The petitioner said that he wanted to testify but that counsel never told him that he had a right to testify.

The petitioner said that in a pretrial statement, the victim's son, Eric Norman, indicated that he knew "who the perpetrators were" and identified one of the perpetrators as "Bone." The petitioner said that he wanted trial counsel to call Mr. Norman to testify to the identity of the perpetrators but that counsel told him that Mr. Norman was "the son of the victim" and that counsel had "been representing him probably, like, over 25 years, so if we do call him as a witness," there "would be certain things that he can't ask him about because prior representation towards him and his family." The petitioner said that he filed two or three "motions to relieve counsel" because counsel "was the victim's family lawyer." He said that the court denied one of the motions and did not address the others.

The petitioner said that his "Aunt Carol" and the father of his aunt's baby told trial counsel that the petitioner had been with them on the night of the offenses. To his knowledge, trial counsel did not speak with anyone else in his family. The petitioner wanted trial counsel to investigate certain issues, including statements by Mr. Haden that the petitioner had a red car and that someone named Tim Sexton had shot a friend of the petitioner in the face. The petitioner said that he did not own a red car and that he "never had a problem" with Mr. Sexton.

The petitioner said that at trial, the State introduced "a .260 rifle and a mask" that had been discovered at the house of Greg Guillory. He said that he had never been to Mr. Guillory's house and that the rifle was "brand new" and had "never been used," and, despite these items having nothing to do with his case, trial counsel failed to object to their introduction.

The petitioner testified that during jury voir dire, the State referred to the area where the offenses occurred as "a war zone" despite the trial court's excluding evidence of gang activity and admonishing the State to avoid referring to the area as "'the wild Wild West.'" The petitioner believed that the prosecutor inflamed the emotions of the jury during voir dire by his comments and by showing pictures of the petitioner's tattoos in an attempt to show that the petitioner was "a thug."

-4-

During cross-examination, the petitioner acknowledged that he filed one of the motions to relieve counsel after trial but said that he "filed two before that which w[ere] never addressed." He said that he waited to move to relieve counsel until the Board "let me know what action was taken" on his complaints. He also said that he sought to have new counsel on appeal because trial counsel "wasn't effective in my trial and I didn't want him to file my appeal or my motion for new trial and mess things up any more worse than they was." He said that he wrote to the Board about trial counsel three times: in "early 2008," "later on in 2008," and the "beginning of 2009." He said that two of the letters were about trial counsel's prior representation of the victim's son and one was about counsel's failure to communicate with him. He acknowledged that he did not raise these issues with the trial court but explained that the Board "wrote me back and they told me that they was going to contact [trial counsel]" and "would let me know what action was taken." He said that in each instance, the Board contacted trial counsel about the complaint and that trial counsel "wrote me back and said he was going to . . . do better, he was going to be more effective then." The petitioner said that he wrote a letter to the trial judge to complain of trial counsel's representation but that he heard from the Board before mailing it. He said that in another instance, he wrote a letter to the trial court in January or February 2009 "and asked him to relieve counsel" but the issue "was never addressed." He said that although he did not receive a hearing on the request for new counsel, trial counsel had been notified about the matter "because he came and asked me about it."

The petitioner said that he "felt like [trial counsel] wasn't fighting for me and doing what he [was] supposed to do for me in my defense because of the fact that he was the victim's family lawyer . . . . I felt like he had loyalty . . . to the victim's family." He said that he did not learn of trial counsel's having previously represented members of the victim's family until February or March 2009. He said that counsel told the trial court of his prior representation of the victim's family because "he had to."

The petitioner said that counsel told him that if he called Mr. Norman as a witness that counsel would not be able to ask Mr. Norman "certain questions" about Mr. Norman's "past and questions about the people that he knew, like the guys he said he knew" because counsel had "represented him prior to my trial." The petitioner explained that Mr. Norman had made a statement that he had seen the four men involved in the shooting and that "he knew the guys personally" and that "nary one of them was me." The petitioner further explained that Mr. Norman "used to be a gang member," and the men that Mr. Norman reported seeing during the shooting were "some of his gang members." Because trial counsel learned of Mr. Norman's gang affiliation in the course of a "client-attorney relationship," counsel said that he "wouldn't be able to ask [Mr. Norman] about his past and about the guys he knew and how did he know them." The petitioner said that trial counsel talked to Mr. Norman sometime before trial and that Mr. Norman "was irate and .

-5-

. . cussed [counsel] out." Trial counsel told the petitioner that Mr. Norman would be a hostile witness if called at trial.

The petitioner said that he had an alibi and that at the time of the offenses, he was at his aunt's house on 28th Street in "the Eastlake area." He acknowledged that he spoke with Mr. Carter at approximately 8:00 p.m. at an Eastlake store the night of the shooting but said that he returned to his aunt's house before the shooting. The petitioner said that although his aunt, Carol Pilcher, testified at trial as an alibi witness, trial counsel should have further investigated alibi witnesses, including Vincent Johnson, the father of Ms. Pilcher's baby, and Ms. Pilcher's teenage son and 11- or 12-year-old daughter, all of whom were at Ms. Pilcher's house when the petitioner arrived that night.

The petitioner acknowledged that trial counsel learned of the negative results of the gunshot residue tests "the day before trial" but said that counsel did not discuss it with him until "[t]he day during trial." He asserted that had trial counsel moved for a continuance as he asked, counsel would have had time to obtain the written reports and "would have been able . . . to actually show to the jury the letters from the TBI personnel that my hands w[ere] negative on gunshot residue and my clothes [were] negative on gunshot residue. He never had the paperwork to show that." The petitioner acknowledged that trial counsel "mentioned" the negative gunshot residue tests at trial.

The petitioner said that during jury voir dire, the State asked the jury, "'Are you familiar with the Eastdale area?'" When the potential jurors indicated that they were, the State said, "'So you know about the gangs and the, and the wild Wild West.'" The petitioner said that the prosecutor then said about the neighborhood: "'Oh, it's a war zone. You never been in Eastdale, it's a war zone.'"

On redirect examination, the petitioner said that the gunshot residue test results that were returned the day before trial indicated that the petitioner's hands and clothes were negative for gunshot residue but that the seat in Mr. Carter's Expedition where Mr. Haden claimed to be seated "the whole entire time" was positive for gunshot residue. The petitioner said that in reviewing the discovery materials and the proceeding transcripts, he discovered inconsistent statements from Mr. Haden and asserted that counsel did not adequately attack Mr. Haden's credibility. He also said that counsel failed to explain to the jury how the petitioner's fingerprints came to be on the inside of the passenger's door of Mr. Carter's vehicle.

Upon questioning by the court and a review of "the rule docket," the petitioner acknowledged that the only letters that he mailed to the trial court seeking to have trial counsel removed from his case were sent after trial. He said that he had written

two other letters to the court but that he "was mistaken" about believing that he had mailed them.

Trial counsel testified that he did not recall any letters from the Board related to his representation of the petitioner but acknowledged that it was "possible I could have gotten one stating . . . that [the petitioner] wanted to see me or something of that nature." Counsel said that the petitioner's assertion that counsel met with him only a few times before trial was "just outrageous." Counsel said that he "went to the TBI office more than once to interview firearm experts, blowback experts, [and a] fingerprint expert." Trial counsel could not recall whether he sought any continuances or whether any were granted in this case but said, "Just like other murder cases, there probably were continuances." He said: "I would not have pushed the [c]ourt to try the case. If the case could have been continued, that would have been fine with me."

As to counsel's prior representation of Mr. Norman, trial counsel said, "I don't know that I was aware that I knew Eric Norman from the outset of the case, but I believe at some point I recalled that I may have represented Eric Norman, and I tried to go back and find out whether I had done so or not." He continued, "It would have been years, probably many years prior to the trial of this case." Counsel said that he did not know what the petitioner meant when he said that counsel was the victim's "family lawyer." Counsel recalled that he "met with Mr. Norman, . . . and he did not want to testify" because he "was concerned about gang violence and he wasn't happy about the idea of coming to court." Trial counsel said that Mr. Norman did not "identify the four people that he said he saw" other than referencing "somebody named Bone." Counsel said that Mr. Norman "would not tell me if he came to court and testified whether he would state that [the petitioner] was involved or whether he was not involved. He wouldn't commit to either one." Mr. Norman also told counsel that "he would wear a tee shirt to court with [the petitioner's] picture on it flashing a gang sign if he had to come to court." Counsel determined that Mr. Norman "was going to be unpredictable and perhaps not helpful." Counsel denied that his prior representation of Mr. Norman affected his decision whether to call him as a witness.

Trial counsel recalled that he objected at trial to the State's use of the mask discovered at Mr. Guillory's house. Counsel also recalled that he met with Ms. Pilcher and another relative of Ms. Pilcher's to investigate the petitioner's alibi defense. Trial counsel said that in hindsight, he "regret[ted] that Ms. Pilcher testified." He said that he did not think that it was a good strategy to call her as a witness but that the petitioner "was emphatic that he wanted her to testify, so I called her."

Trial counsel did remember receiving a letter from Mr. Carter to Mr. Branham but said that the petitioner asked him to speak with Mr. Carter after Mr. Carter had reached out to the petitioner. Trial counsel said that he "met with Mr. Carter, got a

-7-

statement from him" and "[f]iled something with the [c]ourt." He said that he also had Mr. Carter present for the motion for new trial hearing "or some subsequent proceeding, in an effort to bring that evidence to the [c]ourt's attention." He said that he found the information compelling "[a]t the time."

Trial counsel said that the State made an initial plea offer with a 25-year sentence. Through negotiations, the State "came down to 15, and I think the final offer we got was eight years." Trial counsel went with the petitioner's father to speak with the petitioner because, even with the State's plea offer, the petitioner "still wanted to go to trial."

Trial counsel said that "Corey Haden was the State's case" and that other than Mr. Haden's testimony, "there was not a whole lot of evidence that would have tied [the petitioner] to this matter." Counsel said that "[t]here were inconsistencies in [Mr. Haden's] statements" but that "I did the best I could" to address them.

During cross-examination, trial counsel said that he met with Ms. Pilcher and Mr. Johnson and gave notice to the State that he would call both of them as alibi witnesses. Counsel agreed that he represented Mr. Norman on a driving charge and a simple possession of marijuana charge and said that he notified the trial court of this prior representation on March 20, 2009.

Upon questioning by the court, trial counsel said that he did not feel that his prior representation of Mr. Norman created an actual conflict. He acknowledged that he gave the following notice to the trial court: "'I expect testimony of Eric Norman to be favorable to the defendant. I have no intention to impeach this witness.'" "'I obtained no information from my representation of him which might be used for impeachment or any other purpose in this case.'" "'I further represent that I have informed the defendant of my prior representation and that he has no problem with my continuing to represent him.'" Counsel did not recall the petitioner's having any concern over his prior representation of Mr. Norman.

Johnny Lorenzo McMillon, Sr., the petitioner's father, testified that he remembered trial counsel's discussing a plea offer with him one week before trial, but he could not remember the details of the offer. He said that his initial reaction to the plea offer was that the case "should go to trial" because "this was like . . . something just pinned on" the petitioner.

At the close of the evidence, the post-conviction court addressed the issue of the piece of unprocessed evidence discovered at the Medical Examiner's office. The State told the court that it intended to send the item to the TBI laboratory for DNA and ballistics

testing. The post-conviction court determined that it would hold its ruling in abeyance until the test results from the unprocessed evidence were complete and the petitioner had an opportunity to consider any additional post-conviction claims arising from that piece of evidence.

On June 3, 2019, the State entered the TBI test results of the previously-unprocessed piece of evidence as a late-filed exhibit to the evidentiary hearing. On July 11, 2019, the post-conviction court appointed the petitioner new counsel and allowed the petitioner 120 days to "request to reopen the post-conviction hearing." On February 24, 2020, the petitioner moved to reopen the evidentiary hearing to allow him an opportunity to cross-examine the technician who performed the TBI's testing.

The evidentiary hearing was reopened on June 3, 2020. Charly Castelbuono, an employee at the TBI forensic biology unit, testified as an expert in DNA testing and forensic examination. She said that she received a bullet that was identified as being "from the victim's clothing." In her testing of the bullet, she was able to "isolate the DNA" and "determine[] how much was there," but she was not able to develop a DNA profile because she was able to detect only "a very small amount." She said that it was possible that the DNA present on the bullet had somewhat degraded over the years. She said that the bullet had undergone ballistics testing in 2008, and the report of that testing identified the bullet as being "consistent with a .223 REM caliber class metal-jacketed bullet."

In its written order denying post-conviction relief, the post-conviction court concluded that the petitioner failed to establish that he was entitled to post-conviction relief on any issue. Relevant to this appeal, the post-conviction court found that trial counsel had represented only one of the victim's family members "many years prior" on misdemeanor charges, that trial counsel had disclosed the issue, and that counsel's conduct was not impacted by that prior representation. As to the allegation that trial counsel performed deficiently by failing to request a continuance, the post-conviction court concluded that the petitioner was not prejudiced by counsel's conduct, finding that the petitioner was not surprised by any evidence presented at trial. The post-conviction court also found that trial counsel competently cross-examined Mr. Haden and attacked his credibility.

As to counsel's failure to object to certain evidence found at Mr. Guillory's house, the post-conviction court found that this court suggested that a bolt-action rifle collected from Mr. Guillory's front yard that was unrelated to the offenses in this case was relevant evidence because this court mentioned the firearm in its summary of the trial evidence on direct appeal. By the same reasoning, the post-conviction court found that this court suggested that the mask collected from Mr. Guillory's house, also unrelated to the offenses in this case, was irrelevant evidence because this court did not mention the mask in its summary of the evidence. The post-conviction court concluded that counsel did not

perform deficiently by failing to object to the admission of the mask or rifle, finding that neither item inculpated the petitioner despite the admission of the rifle weakening Mr. Guillory's exculpation of the petitioner.

Finally, the post-conviction court determined that the petitioner was not prejudiced by trial counsel's failure to object to multiple comments by the State characterizing the neighborhood as a war zone and implying that the offenses were gang-related. The post-conviction court stated:

> From the evidence of provocations, the apparent indiscriminateness of the retaliation, the number of vehicles and occupants of the vehicles, and Mr. Guillory's unusual role as keeper and lender of the firearms, it was apparent that the offense was committed by a group of perpetrators indistinguishable from a gang.

In this timely appeal, the petitioner reasserts that he was deprived of the effective assistance of trial counsel and that his trial was tainted by prosecutorial misconduct.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

## I. Ineffective Assistance of Counsel

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

As an initial matter, we note that the State, citing Code section 40-30-106(g), argues that the petitioner waived multiple claims of ineffective assistance of counsel by failing to raise in his post-conviction petition the specific instances of deficient performance alleged on appeal. We disagree. Initially, the citation to Code section 40-30-106(g) is inapt because that section refers to the failure to present a claim in a proceeding *before* the post-conviction proceeding at issue. T.C.A. § 40-30-106(g). Code section 40-30-104 requires the post-conviction petitioner to include in his petition "all claims known to the petitioner for granting post-conviction relief" and to "include allegations of fact supporting each claim for relief set forth in the petition." T.C.A. § 40-30-104(d), (e). Here, the petitioner presented a broad claim of ineffective assistance of counsel in his petition and included allegations of fact of numerous instances of alleged deficient performance. He fleshed his claim out by presenting evidence at the evidentiary hearing. Because even multiple allegations of deficient performance constitute only a single claim of ineffective assistance, *see Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) ("Ineffective assistance of counsel is generally 'a single ground for relief' under the post-conviction statute." (citing *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995))), the petitioner, although imprecise in his alleged instances of deficient performance raised in his petitions, has not waived his broad claim of ineffective assistance of counsel.

Considering trial counsel's representation as a whole, we conclude that the petitioner has failed to establish that he is entitled to post-conviction relief on the basis of counsel's representation.

### A. Failure to Object to the State's Improper Remarks

First, the petitioner argues that trial counsel should have objected to the State's multiple insinuations of gang-related activities in this case and the need for the jury to protect the community from further violence by convicting the petitioner. He points to comments the prosecutor made during voir dire, opening statements, and closing arguments, in which the prosecutor referred to the neighborhood where the shooting occurred as a "war zone" and "the Wild West."

Pretrial, the petitioner moved to exclude any testimony that the petitioner or Mr. Branham "is or is not in a gang." During a hearing on the motion, trial counsel told the court: "[The State] and I have agreed among ourselves that neither one of us are going to make any references to gangs, at least initially." The prosecutor added, "[W]e've agreed that if he doesn't say the word 'gang,' I won't say the word 'gang,' . . . . [J]ust for the record, we're agreeing the State is not going to mention the fact that [the petitioner] was a member of the Crips, and the defense isn't going to bring the word 'gang' up either." The trial court noted that a recent local news report had identified the case as being "gang-related," noted that it would ask potential jurors "whether or not anybody's heard anything about the case," and told the State not to "bring up 'gang'" unless the petitioner did so first.

Despite the State's agreement and the court's order to exclude any references to gangs, the State made numerous insinuations to gang-related activity in front of the jury. During voir dire, a potential juror stated that she had served on a jury in an unrelated trial in which she heard gang members testify. Immediately after that comment, the prosecutor said, "Those of you sitting on this trial are going to be hearing from witnesses that come from the street." After explaining to the potential jurors that "some of these witnesses may be hard for you to relate to," the prosecutor asked, "Anyone expect a street killing to have people from the [church] choir?"

Later when a potential juror indicated that he lived near the neighborhood where the offenses occurred, the prosecutor asked him whether he was "familiar with kind of the goings-on that go around that area" and whether "your knowledge . . . would make you think, you know, it's the Wild West out there, if you live down there." The court held a bench conference and reminded the State that it had already been instructed to avoid referring to the neighborhood as a "war zone and Wild West." At that point, trial counsel said, "I mean, maybe I should even move for a mistrial on the record, Judge?" The court replied, "No, it's not, it's not grounds for a mistrial. I don't find that" and warned the State

-12-

to "[b]e careful what you say." The next day, trial counsel asked the court to clarify for the record that he intended his comment during voir dire to be a motion for mistrial, and the trial court found that he had indeed made such a motion.

Before opening statements, the trial court warned the State to try the case on the merits and "not in the context of whether this is a war zone or the Wild West in that community, and whether the jurors need to take action because of what all is going on in that community. That's improper." The prosecutor, nevertheless, began his opening statement by saying: "In voir dire we talked about groups of criminals. Every city has them. . . . . That's what this trial is about, about a group of men who had themselves been shot at or had their friends shot by a group of guys from Eastdale. This is all about the retaliation." The prosecutor also repeatedly referred to the offenses in this case as "street violence," including saying, "[Y]ou will be starkly reminded about how street violence between two groups of men affect everybody. It's tragic when one of those dies, but when someone dies who's not even involved in any of this stuff, it's the worst type of result." Trial counsel did not object to any of these statements.

In closing arguments, the prosecutor began, "You know, we started out talking in voir dire about groups of criminals and how sad that is and how terrifying it can be, especially if you live in a place like Eastdale." The prosecutor said that because Mr. Haden was related to co-defendant Carter, "he was inside this particular group. . . . It was okay for Corey Haden to be hanging out with this group." Later, the prosecutor said of the shooting, "That was a hail of gunfire, just another day in Eastdale . . . ." In referring to the petitioner, the prosecutor said, "I hope you can see that [the petitioner] is a different breed of killer." The prosecutor also said, "Think about this: There's a bolt-action rifle which was not connected to this case in any way, but it's just one more gun that was recovered. It's like deer hunting. How much deer hunting do you think gets done in the city of Chattanooga?" Trial counsel did not object to any of these comments by the State.

Despite multiple warnings and admonitions by the trial court, the State prosecuted the petitioner on the theory that the petitioner was a person of depleted moral character who was involved in "street crime" with a "group of criminals," that the group kept an arsenal of weapons at Mr. Guillory's property, and that the offenses occurred in a crime-infested neighborhood. The State's multiple references to "groups of criminals" involved in "street crime" is a clear reference to gang activity. Furthermore, the State's continued characterization of the Eastdale neighborhood as being a dangerous and crime-ridden area had no purpose other than to inflame the jury's prejudices. The State's improper comments pervaded the trial and were the cornerstone of the State's theory of prosecution. Its characterization of the petitioner and the neighborhood was wholly improper and encouraged the jury to convict the petitioner in order to keep the community safe.

-13-

The record establishes that other than trial counsel's moving for a mistrial during voir dire, trial counsel did not object to the State's characterization of the petitioner or the Eastdale neighborhood during opening statements and closing arguments.

Generally, when and whether to lodge an objection is a matter of strategy that lies within the professional discretion of trial counsel. *See Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL161493, at *15 (Tenn. Crim. App., Jackson, Jan. 15, 2010) ("[A]ttorneys may often choose not to object to damaging evidence for strategic reasons, such as 'to avoid emphasizing [the unfavorable evidence] to the jury'" (quoting *Gregory Paul Lance v. State*, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App., Nashville, Aug. 16, 2006))). Although the State's comments were objectionable, trial counsel is not required to object to every objectional comment. Importantly, the petitioner put on no proof at the evidentiary hearing as to trial counsel's reason for declining to object to the State's conduct. Indeed, trial counsel told the trial court that he was concerned that the jury was becoming annoyed with his multiple objections during the trial. Because there could be tactical reasons for declining to object, the petitioner has failed to establish that trial counsel performed deficiently by failing to object in these instances. *See State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App., Nashville, Jan. 12, 2007) ("Without testimony from trial counsel or some evidence indicating that his decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel."); *Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App., Nashville, Jan. 11, 2012) ("[T]estimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective.").

### B. Failure to Object to Irrelevant Evidence

The petitioner asserts that trial counsel performed deficiently by failing to object to the admission of an irrelevant gun and mask found at Mr. Guillory's house and that the State emphasized the irrelevant evidence to characterize Mr. Guillory's property "as a 'warehouse for criminal activity.'"

At trial, Chattanooga Police Department Investigator Gregory Mardis testified that during a search of Mr. Guillory's property, officers found "a Remington .260-caliber bolt-action rifle in a vehicle in the front yard" and that in searching Mr. Guillory's house, "the only thing I located of any note was a black mask that had been made from the sleeve of a . . . shirt." Trial counsel did not object to the investigator's statements. Investigator Mardis identified a photograph of "the bolt action .260-caliber rifle that was found . . . . in a vehicle in the front driveway of the residence there." Again, trial counsel

-14-

did not object.

The State then offered a rifle into evidence, which Investigator Mardis identified as "the rifle that was in the car in the driveway" of Mr. Guillory's house. The State questioned Investigator Mardis about where the rifle was found, asking, "With the black mask? Was the black mask recovered at Mr. Guillory's house as well?" The investigator replied, "Yes." Trial counsel then asked for a bench conference in which the following exchange occurred:

> [Trial counsel]: Judge, there's been no testimony as to a mask in this case.
>
> THE COURT: Yeah, there was testimony that they recovered a mask.
>
> [Trial counsel]: They found a mask, but right -- it's not really linked to the case in any other way.
>
> THE COURT: I mean, you can bring that out on cross but it doesn't keep me from letting it in, all right?

The State then introduced the black mask into evidence. During cross-examination of Investigator Mardis, trial counsel did not ask any questions related to the bolt-action rifle or the mask.

In closing arguments, the State recounted that after the defendants left the front store, they went

> to [Mr.] Guillory's house, which you might have gathered is basically a warehouse for criminal activity. I mean, [he] keeps multiple firearms there, he kept the pistol afterwards. This is kind of a small side issue. Think about this: There's a bolt-action rifle which was not connected to this case in any way, but it's just one more gun that was recovered. It's like deer hunting. How much deer hunting do you think gets done in the city of Chattanooga? But that's the type of place that's involved in this particular trial.
>
> An assault rifle, a mask, and once they got what they needed for this particular excursion, next stop was Eastdale.

-15-

Trial counsel did not object during the State's closing argument.

Despite its admission at trial that the bolt-action rifle was "not connected to this case in any way," the State argues on appeal that the rifle was relevant to show that the defendants "had reason to know that they could obtain guns at Mr. Guillory's home and that they went to the residence to obtain a gun to later use in the shooting." We disagree. The bolt-action rifle found in the vehicle at Mr. Guillory's house was wholly irrelevant to proving the charges against the petitioner. The only relevance the rifle could have had to this case was to bolster the State's improper characterizations of the petitioner, his associates, and the neighborhood. Again, however, the petitioner did not ask trial counsel a single question about why he did not object to the admission of the rifle, and, thus, he has failed to show that counsel's decision was not a matter of trial strategy. Furthermore, the admission of the rifle, standing alone, did not prejudice the petitioner's case. No evidence suggested, and the State did not argue, that the bolt-action rifle was used in the shooting, and the State relied on it to argue only that Mr. Guillory operated his property as a repository for weapons to be used in criminal activity. Even if counsel had successfully objected to the rifle's admission, the petitioner would not have achieved a different outcome at trial.

As to the mask, trial counsel, although without using the word "objection," seemingly objected to the admission of the mask on the ground of relevance, which objection the trial court implicitly overruled. Consequently, trial counsel was not ineffective in his attempt to keep the mask out of evidence.

### C. Failure to Obtain Written Consent to Conflict of Interests

The petitioner argues that trial counsel performed deficiently by failing to obtain his written consent to counsel's conflict of interests. Specifically, the petitioner argues that trial counsel's having previously represented the victim's son, Eric Norman, whom the petitioner wished to call as a witness at trial, prejudiced his defense.

To succeed on a claim of ineffective assistance of counsel based on an alleged conflict of interests, the petitioner must establish that the conflict was "actual and significant, not irrelevant or 'merely hypothetical.'" *Clifton D. Wallen v. State*, No. E2000-02052-CCA-R3-PC, 2001 WL 839533, at *1 (Tenn. Crim. App., Knoxville, July 25, 2001) (quoting *Howard Clifton Kirby v. State*, No. 03C01-9303-CR-00074, 1994 WL 525086 (Tenn. Crim. App., Knoxville, Sept. 28, 1994)). A mere potential conflict of interests is not enough to establish a claim of ineffective assistance of counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). When an actual conflict of interests exists, prejudice is

presumed but "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 350).

As relevant here, the Tennessee Rules of Professional Conduct provide that "[a] concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Tenn. Sup. Ct. R. 8, RPC 1.7(a)(2). A lawyer may represent a client despite a concurrent conflict of interests if, among other thing, "each affected client gives informed consent, confirmed in writing." *Id.* RPC 1.7(b)(4). Our supreme court "has clarified that an actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)).

The transcript of a pretrial hearing on March 23, 2009, establishes that trial counsel notified the trial court that he had represented Mr. Norman approximately 10 years prior but that he did not "think there's a problem." The trial court confirmed that trial counsel had not obtained confidential information in the course of his representation of Mr. Norman "which might be used for impeachment or any other purpose in this case." Trial counsel also told the court, "I've told [the petitioner] that I represented Mr. Norman a long time ago, and I don't think he has a problem." The trial court asked the petitioner whether trial counsel's statement was true, and the petitioner replied "Yes, sir." The trial court went on to explain to the petitioner that trial counsel would be prohibited from questioning Mr. Norman about confidential information. The trial court told the petitioner that because counsel "doesn't really have any secret information about Mr. Norman," counsel did not have an actual conflict of interests. The petitioner acknowledged to the trial court that counsel had explained the situation to him and told the court that he believed Mr. Norman to be an important witness for his defense. The trial court ruled that trial counsel did not have an actual conflict of interests despite his prior representation of Mr. Norman.

The petitioner has failed to establish that he is entitled to post-conviction relief for trial counsel's failure to obtain his written consent to continued representation. First, the trial court ruled that no actual conflict existed. Based on that ruling, the petitioner's written consent was not required, and, consequently, the petitioner has failed to establish that the trial court would have permitted counsel to withdraw even if the petitioner declined to give written consent. Second, the petitioner put on no proof that he would have declined to give his written consent to counsel's continued representation. Indeed, after explaining the circumstances to the petitioner, the trial court asked him whether he had "any problem" with counsel's having previously represented Mr. Norman,

-17-

and the petitioner indicated that he did not and told the court that he wanted counsel to call Mr. Norman as a witness. Nothing adduced at the post-conviction evidentiary hearing indicated that the petitioner would have responded differently had he been asked to memorialize his response in writing.

Finally, the post-conviction court implicitly accredited trial counsel's testimony and found that Mr. Norman's statement did not exculpate the petitioner; it simply "did not name any perpetrator" other than someone named "Bone" "and therefore did not include or exclude the petitioner." The post-conviction court also found, based on counsel's testimony, that counsel chose not to call Mr. Norman as a witness "not because of the prior representation but because of Mr. Norman's attitude and unpredictability." The record supports the trial court's findings and, consequently, this issue lacks merit.

### D. Failure to Seek Continuance

The record indicates that the trial court granted the petitioner a continuance on March 3, 2009, to allow him to interview a State witness, call a witness that was unavailable for the original trial date, and prepare a defense strategy in light of a co-defendant's last-minute guilty plea. The trial was rescheduled to March 24, 2009. The petitioner alleges that counsel performed deficiently by failing to seek another continuance to further investigate the case. During a pretrial conference on March 23, 2009, trial counsel expressed concern that he had not been able to interview several State witnesses, that he had not had an opportunity to look at pieces of clothing the State intended to introduce as evidence, that he had did not receive the results of a gunshot residue test until that day, and that he had not been able to find Mr. Guillory to serve him with a subpoena to appear as a witness. The trial court noted that the State's waiting until the last minute to order the gunshot residue test "doesn't mean that we can't go to trial, but it does mean that [trial counsel] needs every opportunity in the world, every opportunity that he wants to be able to explore what this means." The trial court ordered the State to facilitate trial counsel's review of the evidence in the State's possession and his interviewing of the State's expert witnesses before trial the next day. Because the trial court addressed the petitioner's concerns without continuing the trial, the petitioner cannot show that trial counsel would have succeeded had he sought a second continuance. Consequently, the petitioner cannot show that trial counsel performed deficiently in this matter.

### E. Failure to Object to use of the Victim's Photograph

The petitioner asserts that trial counsel performed deficiently by failing to properly object to the State's use of a life photograph of the victim during voir dire to establish whether any potential juror knew the victim. He argues that the photograph was irrelevant because the victim's identity was not at issue and because the State had already

asked whether any potential juror knew the victim by name.

The trial record establishes that during jury voir dire, and outside the presence of the jury, the State asked the trial court for permission to show the potential jurors a photograph of the victim while alive to determine whether any of the potential jurors knew him. Trial counsel implicitly objected by saying: "Judge, I don't know. I don't know what -- I don't know that it's relevant, Judge. I don't think anybody knew Larry Parks." The trial court ruled, "I don't think it hurts to let them see the victim to make sure that they didn't know who he was." Trial counsel then argued that the State was attempting to use the photograph "to probably make the victim more human and to evoke sympathy." The court concluded that the State could show the photograph during voir dire, noting, "I don't think there's anything about that photograph that particularly evokes sympathy."

This exchange reveals that trial counsel objected to the potential juror's viewing the photograph and that the trial court overruled the objection. The petitioner has failed to show that a more artful objection would have been successful.

### F. Ineffective Cross Examination of Mr. Haden

The petitioner argues that trial counsel ineffectively cross-examined Mr. Haden because he had failed to fully investigate the results of the gunshot residue testing. The petitioner asserts that a more-effective cross-examination would have diminished Mr. Haden's credibility and bolstered the evidence of Mr. Haden's being an accomplice.

As we explained above, the State did not provide trial counsel the results of the gunshot residue test until the day before trial, but the trial court concluded that a continuance was unnecessary under the circumstances and addressed the petitioner's concerns in other ways. The petitioner has failed to show what additional preparation trial counsel could have done had he had additional time to consider the gunshot residue results. Moreover, the petitioner did not call Mr. Haden at the evidentiary hearing to establish what his testimony would have been had trial counsel asked additional questions on cross-examination. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (An appellate court cannot "speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel."). Consequently, the petitioner has failed to establish that trial counsel performed deficiently by not further cross-examining Mr. Haden.

### G. Failure to Cross-Examine Doctor Goolsby

The petitioner argues that trial counsel should have cross-examined Doctor

-19-

Mary Goolsby who had testified about a bullet found on the floor during the victim's autopsy. Although the petitioner did not question trial counsel at the evidentiary hearing as to his reasons for not cross-examining the doctor, the trial transcript shows that his decision was clearly a strategic one. The trial court stood in recess for the day at the end of Doctor Goolsby's direct testimony, and the court gave trial counsel at least 20 minutes to confer with the petitioner and decide whether to cross-examine the doctor the next day. Trial counsel opted not to cross-examine her, and he explained his reasonings to the court. This is precisely the sort of tactical decision left to the sound discretion of trial counsel. *See Adkins*, 911 S.W.2d at 347. Furthermore, the petitioner did not present Doctor Goolsby at the evidentiary hearing to establish what her testimony would have been had counsel cross-examined her, and we will not speculate about her potential testimony. *See Black*, 794 S.W.2d at 757.

## H. Failure to Raise Certain Objections

The petitioner raises several instances of trial counsel's failing to object to multiple statements of hearsay and speculation.

The trial record shows that trial counsel did indeed object to a statement from Mr. Haden about comments made by Mr. Carter. The trial court cautioned the State not to ask Mr. Haden what Mr. Carter had said and ruled that it would allow the State to lead Mr. Haden "a little bit" to keep Mr. Haden from testifying to hearsay. The trial court also allowed the State to ask Mr. Haden "what was the conversation about and things of that nature." The State asked Mr. Haden a series of questions about his interactions with Mr. Carter, including what their conversation was about. After Mr. Haden testified to riding to "the front store" with Mr. Carter, the State asked: "and now, would you go ahead and tell the Court, the jury what you heard and what you saw at the front store." Mr. Haden then repeated a conversation that he heard between the petitioner and Mr. Carter, and trial counsel did not object. The State's question undoubtedly called for hearsay. It is unclear, however, why trial counsel did not object because the petitioner failed to ask counsel a single question about it at the evidentiary hearing. Similarly, the petitioner did not ask trial counsel about his reasons for declining to object to the other instances of alleged hearsay and speculation.

Generally, when and whether to object at trial is a matter of strategy that is within trial counsel's discretion. *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL161493, at *15 (Tenn. Crim. App., Jackson, Jan. 15, 2010) ("[A]ttorneys may often choose not to object to damaging evidence for strategic reasons, such as 'to avoid emphasizing [the unfavorable evidence] to the jury'" (quoting *Gregory Paul Lance v. State*, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App., Nashville, Aug. 16, 2006))). Because the petitioner has failed to present any evidence showing that

counsel's failure to object to instances of hearsay and speculation was anything other than strategic, he has failed to establish that counsel performed deficiently.

### I. Failure to Present a Defense

The petitioner asserts that trial counsel failed to put forth a defense, pointing to counsel's failure to corroborate Ms. Pilcher's alibi testimony, failure to rehabilitate Ms. Pilcher's credibility, and calling Doctor Frank King as a witness. He argues that additional alibi witnesses were necessary to corroborate Ms. Pilcher's testimony because Ms. Pilcher was impeached on cross-examination. The petitioner, however, failed to call any potential alibi witness at the evidentiary hearing, and, consequently, he has failed to establish that counsel performed deficiently by failing to present their testimony. *See Black*, 794 S.W.2d at 757. Moreover, the decision of what witnesses to call and what questions to ask lies within the discretion of trial counsel, and the petitioner has failed to show that counsel performed deficiently in his questioning Ms. Pilcher and his calling Doctor King.

### J. Failure to Relay Plea Offer

The petitioner argues that trial counsel did not tell him about the State's plea offer. The only relevant evidence presented at the post-conviction hearing, however, was trial counsel's testimony that he had the petitioner's father come with him to tell the petitioner of the plea offer and the petitioner's father's testimony that counsel had, indeed, included him in the plea discussion. Trial counsel's testimony established that despite the plea offer, the petitioner wanted to go to trial. Because the only evidence in the record belies the petitioner's assertion that counsel failed to tell him of the State's plea offer, he is not entitled to relief on this matter.

### K. Cumulative Error

The petitioner argues that the cumulative effect of trial counsel's errors prejudiced his trial. Because, however, the petitioner has failed to establish a single instance of deficient performance by trial counsel, this argument lacks merit.

### II. Prosecutorial Misconduct

Related to his claim of trial counsel's failure to object to the State's improper comments, the petitioner raises a stand-alone claim of prosecutorial misconduct, arguing that the State committed prosecutorial misconduct when it made improper and prejudicial remarks to the jury. This claim, however, is waived for failure to raise it on direct appeal. *See* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court

-21-

of competent jurisdiction in which the ground could have been presented . . . ."); *Brown v. State*, 489 S.W.2d 268, 270 (Tenn. Crim. App. 1972) ("All trial questions are first determined in the trial court. If the losing party chooses to accept that determination without appeal, it is as final and binding as if affirmed by the highest appellate court."); *Laraiel Winton v. State*, No. E2011-00762-CCA-R3-PC, 2012 WL 273759 (Tenn. Crim. App., Knoxville, Jan. 31, 2012) (finding a post-conviction petitioner's claim of prosecutorial misconduct waived "for failure to present it on direct appeal").

*Conclusion*

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE